UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALEXANDER H. LINDSAY, JR. and CHARLES R. BLACKBURN, Derivatively on Behalf of PPG INDUSTRIES, INC., | ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| MICHAEL H. McGARRY, CHARLES E. BUNCH, VINCENT J. MORALES, MARK C. KELLY, STEPHEN F. ANGEL, JAMES G. BERGES, JOHN V. FARACI, HUGH GRANT, VICTORIA F. HAYNES, MELANIE L. HEALEY, GARY R. HEMINGER, MICHELE J. HOOPER, MICHAEL W. LAMACH, ROBERT MEHRABIAN, MARTIN H. RICHENHAGEN, ROBERT RIPP, THOMAS J. USHER and DAVID R. WHITWAM, | ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants, | ) |
| | ) |
| – and – | ) |
| | ) |
| PPG INDUSTRIES, INC., a Pennsylvania corporation, | ) ) |
| | ) |
| Nominal Defendant. | ) |
| | ) |

Civ. Action No.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND STATE LAW CLAIMS FOR BREACHES OF FIDUCIARY DUTIES, ABUSE OF CONTROL, CORPORATE WASTE AND UNJUST ENRICHMENT

DEMAND FOR JURY TRIAL

## INTRODUCTION AND SUMMARY OF THE ACTION

1.       This is a shareholder derivative action brought by two long-term shareholders of PPG Industries, Inc. ("PPG" or the "Company") on behalf of the Company against the members of its current Board of Directors (the "Board") and certain of its current and/or former senior directors and executives (collectively, "Defendants").

2.       Nominal party PPG manufactures and distributes a broad range of paints, coatings, and specialty materials.  With headquarters in Pittsburgh, Pennsylvania, PPG operates in more than 70 countries around the globe.  By revenue it is the largest coatings company in the world.  PPG's business comprises two reportable business segments: Performance Coatings and Industrial Coatings.

3.       This action seeks to remedy Defendants' violations of federal and state law, including violations of the federal securities laws, breaches of fiduciary duties, abuse of control, corporate waste, and unjust enrichment, arising out of two separate, but overlapping, schemes and wrongful courses of business and corporate governance, whereby: (i) Defendants caused and/or failed to prevent PPG from continuing to discharge glass dump waste water into Glade Run and the Allegheny River in violation of an Administrative Order (defined below), resulting in PPG being named as a defendant in a lawsuit brought by PennEnvironment and the Sierra Club for violations of Pennsylvania's Clean Streams Law, the U.S. Clean Water Act, and the U.S. Resource Conservation and Recovery Act ("RCRA") (the "*PennEnvironment* Action"), which seeks, among other things, the assessment of millions of dollars in civil penalties against PPG; and (ii) Defendants caused PPG to misstate its publicly reported financial results for fiscal year 2016 ("FY16"), the four interim quarters of fiscal year 2017 ("FY17"), and the first interim quarter of fiscal 2018 ("1Q18") (collectively, the "Restatement Period") in violation of Generally Accepted Accounting Principles ("GAAP"), to operate without effective internal controls to facilitate the false financial reporting,

and to file false and misleading statements with the Securities and Exchange Commission ("SEC"). Specifically, during the Restatement Period, Defendants delayed the recognition of certain expenses and misclassified certain categories of income.  By manipulating these reported results, Defendants moved expenses from a troubled quarter to one where the Company was performing strongly and in that way "smoothed" PPG's financials so it would appear that PPG was consistently meeting expectations.  Due to the ineffective and inadequate internal controls Defendants caused PPG to operate with, the accounting misstatement scheme operated for nearly a year and a half without notice.

4.      Defendants' malfeasance, mismanagement, and self-dealing during the relevant period has wreaked or threatened to wreak hundreds of millions of dollars of damages on PPG. Meanwhile, based on the purported "profits" the Company was reporting as a result of its operating in violation of the Administrative Order and state and federal environmental laws, Defendants justified paying PPG's senior executives tens of millions of dollars in outsized executive compensation and perquisites, with the *Pittsburgh Post-Gazette* consistently ranking former PPG Chief Executive Officer ("CEO") Charles E. Bunch as one of the highest, if not the highest, paid senior executives at a Pittsburgh-based publicly traded company – besting the senior executives at Mylan, Consol Energy, U.S. Steel, GNC, and PNC Financial Services – every year up until his retirement,  including the years following the filing of the *PennEnvironment* Action in 2012.  The Company's senior executives and directors were also incentivized to issue false and misleading financial reports and statements during the Restatement Period in order to increase their executive compensation, which was based in large part on PPG's reported financial results.  Meanwhile, Defendants were causing PPG to engage in a share buy-back whereby the Company repurchased more than 15 million shares of PPG common stock on the open market at artificially inflated prices, thereby causing PPG to overpay an estimated more than $132 million for those shares.  As a result of

Defendants' misconduct, after disclosing on June 28, 2018 that PPG would be forced to restate its previously reported financial results for the Restatement Period and admitting that its lack of internal controls had facilitated the false financial reporting, the Company was sued in this Court by purchasers of its common stock in a class action lawsuit for violations of the federal securities laws, which recently settled, with PPG paying $25 million to the class (the "Securities Fraud Class Action").  PPG also remains subject to investigations by both the U.S. Department of Justice (the "DOJ") and the SEC into the Company's improper accounting practices.  These investigations have been a drag on PPG as they divert employees' time and resources in addition to costing millions of dollar each quarter.

5.      Defendants' malfeasance, misrepresentations, self-dealing, and wrongful course of conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"), as well as Pennsylvania and Delaware law, exposing PPG to criminal and civil liability.  By authorizing and/or acquiescing in the environmental law violations and the accounting misstatements, Defendants: (i) exposed PPG to hundreds of millions of dollars of civil liability in the *PennEnvironment* Action and additional fines and penalties if PPG is penalized for violating the Administrative Order, along with significant reputational harm; (ii) forced PPG to expend millions of dollars investigating and responding to the *PennEnvironment* Action and to suffer significant monetary and reputational harm in the process; (iii) caused PPG to issue materially false and misleading financial reports and to file materially false and misleading financial statements with the SEC throughout the Restatement Period; (iv) caused PPG common stock to trade at artificially inflated prices throughout the Restatement Period, facilitating the payment of millions of dollars in excessive executive compensation based on faulty financial reporting; (v) caused PPG to waste more than $132 million overpaying to repurchase its own shares at artificially inflated prices during the Restatement Period; and (vi) exposed PPG to

potentially hundreds of millions of dollars in liability to its investors and regulators, including the SEC and the DOJ.

6.      In light of the foregoing, on April 30, 2018, plaintiffs, through their counsel, wrote to the Board demanding that it take action in relation to the environmental law violations, including bringing legal proceedings against specific wrongdoers.  A copy of that letter is attached hereto as Exhibit A.  On May 16, 2018, plaintiffs received a letter stating that the Board had appointed a Special Litigation Committee ("SLC") pursuant to 15 Pa. Cons. Stat. §1783(a), comprising defendants Faraci, Heminger, and Healey.  A copy of that letter is attached hereto as Exhibit B.[1]  The Board appointed these three individuals to the SLC despite the fact that the stockholders had identified all three of them as having breached their fiduciaries duties in the demand letter, and as such they were the subjects of the demand.

7.      Following the announcement that PPG would have to restate its previously reported financial results throughout the Restatement Period, on August 6, 2018, plaintiffs attempted to augment their demand to include the accounting misconduct.  *See* Ex. F.  In light of the PPG Board's request that a separate demand be sent related to the accounting misstatements, on August 23, 2018, plaintiffs sent a separate demand to the PPG Board to investigate and take action, including bringing legal proceedings against specific wrongdoers.  *See* Exs. G and H.  On October 25, 2018, the PPG Board's counsel responded, stating that the same SLC appointed to investigate the environmental law violation demand would also investigate the accounting misstatement demand, yet noting that defendant Heminger was no longer serving as a member of the SLC.  *See* Ex. I.

8.      After more than nine months had transpired since the first demand letter was sent and more than three months had transpired since the second demand letter was sent, with no response

---

[1]      Plaintiffs' May 17, 2018 response to the May 16, 2018 letter is attached as Exhibit C, the PPG Board's June 8, 2018 response to that letter is attached as Exhibit D, and plaintiffs' June 8, 2018 response is attached as Exhibit E.

from the SLC as to either demand, on February 14, 2019, plaintiffs wrote to the SLC's counsel requesting "a detailed update as to the SLC's status and estimated date of completion," emphasizing that, "while simply waiting out the SEC and DOJ investigations may serve the interests of certain 'responsible parties,' it is our position that the same threatens to compromise the interests of PPG." *See* Ex. J.  Counsel for the SLC responded on March 20, 2019, stating that it was "not aware of any basis on which to believe PPG would be prejudiced if the SLC were to make its determination after the SEC and DOJ investigations are complete." *See* Ex. K.  Intimating the SLC investigation could go on for years, the letter ended, stating in pertinent part that the "making of a demand automatically tolls any applicable statute of limitations with respect to a claim asserted . . . until the SLC makes its determination." *Id.*  On June 6, 2019, counsel for the SLC announced that Catherine R. Smith and Steven A. Davis had been added to the SLC.  *See* Ex. L.

9.     Despite the fact that PPG has since settled the Securities Fraud Class Action, plaintiffs have yet to receive a response from PPG, the Board, or the SLC's counsel with respect to either demand.

10.     Pennsylvania has adopted the American Law Institute (the "ALI") principles for responding to litigation demands.  The ALI in turn has explained that the length of time for an investigation into a litigation demand "should never exceed several months even when a study is undertaken and seldom should be that long."  The ALI has explained that delay of six months or more "would often prejudice the plaintiff."  Accordingly, the SLC's never-ending conflicted investigation is in violation of Pennsylvania law.

11.     Through this action, plaintiffs seek to vindicate PPG's interests against its faithless fiduciaries, as PPG's Board, as currently composed, is unable or unwilling to do so.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5), promulgated thereunder, and under state law for breaches of fiduciary duties, abuse of control, corporate waste, and unjust enrichment.   In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

13.     This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act (15 U.S.C. §78aa), as well as 28 U.S.C. §1331.  This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

14.     This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

15.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa), as well as 28 U.S.C. §1391(b).  PPG is headquartered in Pittsburgh, Pennsylvania.  Many of the acts alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

## PARTIES

**Plaintiffs**

16.     Plaintiff Alexander H. Lindsay, Jr. is and continuously has been a shareholder of PPG since August 1955.

17.     Plaintiff Charles R. Blackburn is and continuously has been a shareholder of PPG since July 2010.

**Nominal Party**

18.     Nominal party PPG Industries, Inc. is a Pennsylvania corporation and global supplier of paints, coatings, and specialty materials.

**Defendants**

19.     Defendant Michael H. McGarry ("McGarry") is, and has been since September 2015, the CEO of PPG and is, and has been since September 2016, the Chairman of the PPG Board. Previously, McGarry, who joined PPG in 1981, was named General Manager Fine Chemicals in 2000; Vice President ("VP") Chlor-Alkali and Derivatives in 2004; VP Coatings Europe and Managing Director PPG Europe in 2006; Senior VP of the Commodity Chemicals reporting segment in 2008; Executive VP and Chief Operating Officer ("COO") of PPG in 2014; and President and COO of PPG in March 2015.  PPG has consistently and "affirmatively determined that Michael H. McGarry is not independent [of other Board members] because he is an officer of PPG."  Defendant McGarry was named as a defendant in the Securities Fraud Class Action.  Because of defendant McGarry's positions, he knew the adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  During the relevant period, defendant McGarry participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

20.     Defendant Charles E. Bunch ("Bunch") was, between 2005 and 2015, CEO of PPG and between 2002 and 2016, a director of PPG.  Because of defendant Bunch's positions, he knew the adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  During the relevant period, defendant Bunch participated in the issuance and

preparation of materially false and/or misleading statements, including press releases and SEC filings.

21.      Defendant Vincent J. Morales ("Morales") is, and has been since March 2017, PPG's Senior Vice President and Chief Financial Officer ("CFO").  Previously, Morales was PPG's Vice President, Finance from June 2016 to February 2017; Treasurer from June 2015 to June 2016; and Vice President, Investor Relations from October 2007 to June 2016.  Defendant Morales was named as a defendant in the Securities Fraud Class Action.  Because of defendant Morales's positions, he knew the adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  During the relevant period, defendant Morales participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

22.      Defendant Mark C. Kelly ("Kelly") was PPG's Vice President, Controller, and Principal Accounting Officer between September 2013 and May 2018, when his employment was terminated.  Defendant Kelly was named as a defendant in the Securities Fraud Class Action.  Because of defendant Kelly's positions, he knew the adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  During the relevant period, defendant Kelly participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

23.     Defendant Stephen F. Angel ("Angel") is, and has been since 2010, a director of PPG. Defendant Angel has served as a member of the Board's Compensation Committee since 2013; as a member of the Board's Technology and Environment Committee since 2011 (having served as its Chair between 2015 and 2017); and previously served on the Board's Nominating and Governance Committee between 2011 and 2012.  Because of defendant Angel's position, he knew the adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the relevant period, defendant Angel participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

24.     Defendant James G. Berges ("Berges") is, and has been since 2000, a director of PPG.  Defendant Berges has served as a member of the Board's Nominating and Governance Committee since 2009; as a member of the Board's Compensation Committee since 2015 (and as its Chair since 2017); and previously served as a member of the Board's Audit Committee between 2009 and 2014.   Because of defendant Berges's position, he knew the adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the relevant period, defendant Berges participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

25.     Defendant John V. Faraci ("Faraci") is, and has been since 2012, a director of PPG. Defendant Faraci has served as a member of the Board's Nominating and Governance Committee

since 2013; as a member of the Board's Technology and Environment Committee since 2016; and previously served on the Board's Audit Committee between 2013 and 2015. Because of defendant Faraci's position, he knew the adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the relevant period, defendant Faraci participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

26.     Defendant Hugh Grant ("Grant") is, and has been since 2005, a director of PPG. Defendant Grant has served as a member of the Board's Compensation Committee since 2011; served as a member of the Board's Nominating and Governance Committee between 2009 and 2013 and as its Chair from 2014 to 2018; and previously served as a member of the Board's Technology and Environment Committee between 2009 and 2010. Because of defendant Grant's position, he knew the adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the relevant period, defendant Grant participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

27.     Defendant Victoria F. Haynes ("Haynes") is, and has been since 2003, a director of PPG. Defendant Haynes has served as a member of the Board's Audit Committee since 2011; as a member of the Board's Technology and Environment Committee since 2009 (having served as its

Chair since 2018); and previously served as a member of the Board's Nominating and Governance Committee between 2009 and 2010.  Because of defendant Haynes's position, she knew the adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to her in connection therewith. During the relevant period, defendant Haynes participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

28.     Defendant Melanie L. Healey ("Healey") is, and has been since 2016, a director of PPG.  Defendant Healey has served as a member of the Board's Audit Committee since 2017; and as a member of the Board's Technology and Environment Committee since 2017.   Because of defendant Healey's position, she knew the adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to her in connection therewith.  During the relevant period, defendant Healey participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

29.     Defendant Gary R. Heminger ("Heminger") is, and has been since 2017, a director of PPG.  Defendant Heminger has served as a member of the Board's Audit Committee since 2018; and as a member of the Board's Nominating and Governance Committee since 2018.   Because of defendant Heminger's position, he knew the adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and

employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  During the relevant period, defendant Heminger participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

30.     Defendant Michele J. Hooper ("Hooper") is, and has been since 1995, a director of PPG.  Defendant Hooper has served as a member of the Board's Nominating and Governance Committee since 2009; as a member of the Board's Technology and Environment Committee since 2017; and previously served as the Chair of the Board's Audit Committee between 2009 and 2016. Because of defendant Hooper's position, she knew the adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to her in connection therewith.  During the relevant period, defendant Hooper participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

31.     Defendant Michael W. Lamach ("Lamach") is, and has been since 2015, a director of PPG.  Defendant Lamach has served as a member of the Board's Audit Committee since 2016; as a member of the Board's Compensation Committee since 2017; and previously served as a member of the Board's Nominating and Governance Committee in 2016.  Because of defendant Lamach's position, he knew the adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  During the relevant period, defendant Lamach participated

in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

32.     Defendant Robert Mehrabian ("Mehrabian") was, between 1992 and 2014, a director of PPG.  Defendant Mehrabian served as a member of the Board's Compensation Committee between 2009 and 2014; and as Chair of the Board's Technology and Environment Committee between 2009 and 2014.  Because of defendant Mehrabian's positions, he knew the adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith. During the relevant period, defendant Mehrabian participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

33.     Defendant Martin H. Richenhagen ("Richenhagen") is, and has been since 2007, a director of PPG.  Defendant Richenhagen has served as a member of the Board's Audit Committee since 2009 (and has served as its Chair since 2017); as a member of the Board's Compensation Committee since 2017; and was previously a member of the Board's Technology and Environment Committee between 2009 and 2016.  Because of defendant Richenhagen's position, he knew the adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  During the relevant period, defendant Richenhagen participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

34.     Defendant Robert Ripp ("Ripp") was, between 2003 and 2014, a director of PPG. Defendant Ripp served as a member of the Board's Audit Committee between 2009 and 2014; and as a member of the Board's Compensation Committee between 2009 and 2014.  Because of defendant Ripp's position, he knew the adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  During the relevant period, defendant Ripp participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

35.     Defendant Thomas J. Usher ("Usher") was, between 1996 and 2016, a director of PPG.  Defendant Usher served as the Chair of the Board's Compensation Committee between 2009 and 2016; and as a member of the Board's Technology and Environment Committee between 2009 and 2016.  Because of defendant Usher's position, he knew the adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  During the relevant period, defendant Usher participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

36.     Defendant David R. Whitwam ("Whitwam") was, between 1991 and 2014, a director of PPG.   Defendant Whitwam previously served as Chair of the Board's Nominating and Governance Committee between 2009 and 2014; and as a member of the Board's Compensation Committee between 2009 and 2014.  Because of defendant Whitwam's position, he knew the

adverse non-public information about the business of PPG, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to him in connection therewith.  During the relevant period, defendant Whitwam participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

37.     The defendants identified above in ¶¶19, 23-31 and 33 comprise the current Board as of the filing of this complaint and are sometimes referred to herein as the "Director Defendants." The defendants identified above in ¶¶19-22 are sometimes referred to herein as the "Officer Defendants."

## DEFENDANTS' DUTIES

38.     Each officer and director of PPG named herein owed the Company and PPG shareholders the duty to exercise a high degree of care, loyalty, and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of PPG's directors and officers complained of herein involves knowing, intentional, and culpable violations of their obligations as officers and directors of PPG.  Further, the misconduct of PPG's officers has been ratified by PPG's Board, which has failed to take any legal action on behalf of the Company against them.

39.     By reason of their positions as officers, directors, and fiduciaries of PPG and because of their ability to control the business and corporate affairs of the Company, Defendants owed PPG and its shareholders fiduciary obligations of candor, trust, loyalty, and care, and were required to use their ability to control and manage PPG in a fair, just, honest, and equitable manner, and to act in furtherance of the best interests of PPG and its shareholders so as to benefit all shareholders equally

and not in furtherance of their personal interest or benefit. In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to cause PPG to comply with all applicable laws and to refrain from utilizing their control over PPG to divert assets to themselves via improper and/or unlawful practices. Defendants also had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings, and compensation practices.

40.     Because of their positions of control and authority as directors and/or officers of PPG, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein. These acts include: (i) agreement to and/or acquiescence in causing and/or permitting PPG to violate the Administrative Order and to violate state and federal environmental laws; (ii) agreement to and/or acquiescence in Defendants' false financial reporting; (ii) permitting PPG to operate with defective internal controls; and (iii) allowing certain Defendants to unjustly enrich themselves to the detriment of the Company. Because of their positions with PPG, each of the Defendants was aware of these wrongful acts, had access to adverse non-public information, and was required to disclose the information promptly and accurately to PPG shareholders and the financial markets, but failed to do so.

41.     To discharge their duties, the directors of PPG were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the business and financial affairs of PPG. By virtue of such duties, the officers and directors of PPG were required, among other things, to:

(a)     manage, conduct, supervise, and direct the business affairs of PPG in accordance with all applicable law (including federal and state laws, government rules and regulations, and the charter and bylaws of PPG);

(b)     neither engage in self-dealing nor knowingly permit any officer, director or employee of PPG to engage in self-dealing;

(c)      neither violate nor knowingly permit any officer, director or employee of PPG to violate applicable laws, rules and regulations;

(d)      remain informed as to the status of PPG's operations, including its compliance with all environmental laws and its accounting practices, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the applicable state and federal environmental laws, the Administrative Order, U.S. federal securities laws, and their duty of candor to the Company's shareholders;

(e)      prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options, and other incentive compensation) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)      establish and maintain systematic and accurate records and reports of the business and affairs of PPG and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)      maintain and implement an adequate, functioning system of internal legal, financial, and accounting controls, such that PPG's financial statements – including its expenses, accounting and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)      exercise control and supervision over the public statements to the securities markets and trading in PPG stock by the officers and employees of PPG; and

(i)      supervise the preparation and filing of any financial reports or other information required by law from PPG and to examine and evaluate any reports of examinations,

audits or other financial information concerning the financial affairs of PPG and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

**Additional Duties of the Audit Committee Defendants**

42.     In addition to these duties, under the Audit Committee Charter, defendants Berges, Faraci, Haynes, Healey, Heminger, Hooper, Lamach,  Richenhagen and Ripp owed specific duties to PPG to assist the Board in managing risk, ensuring PPG was in compliance with all applicable state and federal environmental law and the Administrative Order, and overseeing the integrity of the Company's financial statements and the Company's compliance with legal and regulatory oversight. In this regard, the Audit Committee Charter provides in pertinent part as follows:

**Audit Committee Purpose**

The purpose of the Committee is to:

- assist the Board of Directors in oversight of

- the integrity of the Company's financial statements;

- the Company's compliance with legal and regulatory requirements;

*        *        *

5.    At least annually, obtain and review a report by the [outside auditors] describing: the firm's internal quality-control procedures; any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and to assess the auditor's independence considering relationships between the [outside auditors] and the Company.

*        *        *

13.    Discuss the annual audited financial statements (Form 10-K) and quarterly financial statements (Form 10-Q) with management and the [outside auditors], including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."  Review the scope and effectiveness of the Company's disclosure controls and procedures, including the certifications made by the CEO and CFO.

*      *      *

17.   Review with management, the internal auditing department and the [outside auditors], as appropriate, (i) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; (ii) any major issues as to the adequacy of the Company's internal controls over financial reporting and disclosure controls and procedures, including the [outside auditor's] report on the Company's internal control over financial reporting; (iii) analyses prepared by management and/or the [outside auditors] setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative [generally accepted accounting principles ("GAAP")] methods on the financial statements; (iv) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and (v) discuss any fraud, regardless of materiality, involving management or other employees having a significant role in internal controls over financial reporting.

*      *      *

25.   Oversee the Company's policies and procedures with respect to risk assessment and risk management.  Discuss with management significant business, accounting and financial risks and exposures, the Company's policies and procedures for assessing and managing these risks and assure accountability is assigned to management and aligned with the responsibilities of the Board or its Committees.

**Additional Duties of the Compensation Committee Defendants**

43.    In addition to these duties, under the Compensation Committee Charter, defendants Angel, Berges, Grant, Lamach, Mehrabian, Richenhagen, Ripp, Usher and Whitwam owed specific duties to PPG to assist the Board in administering PPG's compensation plans applicable to, and fixing the compensation and benefits of, all of executive officers and directors of PPG, with a particular eye toward discouraging false financial reporting and excessive risk taking.  In this regard, the Compensation Committee Charter provides in pertinent part as follows:

**<u>Purpose and Responsibilities</u>**. The purpose of the Committee is to discharge certain of the Board's responsibilities relating to compensation of the Company's officers, Directors and certain other executives. The Committee has the following responsibilities:

A.  Approve, adopt, administer, interpret, amend, suspend or terminate the compensation plans of the Company applicable to, and fix the compensation and benefits of (a) all officers of the Company serving as Directors of the Company, and

(b) all executive officers (as defined under the Securities Exchange Act of 1934) of the Company.

B. Review and approve corporate goals and objectives relevant to the Chief Executive Officer's ("CEO") compensation, evaluate, based on full Board input, the CEO's performance in light of those goals and objectives, and set the CEO's compensation level based on this evaluation.

C. Review, approve and, where appropriate, make recommendations to the Board of Directors with respect to the Company's executive incentive compensation plans, equity based compensation plans and Director's compensation.

D. Review the Company's compensation practices to ensure that they do not encourage unnecessary and excessive risk taking.

**Additional Duties of the Technology and Environment Committee Defendants**

44.     In addition to these duties, under the Technology and Environment Committee Charter, defendants Angel, Faraci, Grant, Haynes, Healey, Hooper, Mehrabian, Richenhagen and Usher owed specific duties to PPG to assist the Board in overseeing risks related to its environmental, health, safety, and product stewardship, in particular with regard to those risks that could have a material impact on the Company's business operations.  In this regard, the Technology and Environment Committee Charter provides in pertinent part as follows:

Purpose and Responsibilities. The purpose of the Committee is to review and provide oversight of programs, initiatives and activities of the Company in the areas of science, technology and sustainability. The Committee has the following responsibilities:

A. Review with the management of the Company the science and technology capabilities of the Company in relation to its corporate strategies and plans.

B. Review with the management of the Company the technologies that can have a material impact on the Company, which may include product, application and process development technologies.

C. Review with the management of the Company the status of the Company's environment, health, safety, product stewardship and other sustainability policies, programs and practices in these areas.

D. Review with the management of the Company the current and emerging environment, health, safety, product stewardship and other sustainability issues in these areas that can have a material impact on the Company.

E.  Oversee the management of risks related to the Company's science and technology portfolio, research and development capabilities, and environment, health, safety, product stewardship and other sustainability programs in these areas, including risks related to reputation.

**Additional Duties of the Nominating and Governance Committee Defendants**

45.   In addition to these duties, under the Nominating and Governance Committee Charter, defendants Angel, Berges, Faraci, Grant, Haynes, Heminger, Hooper, Lamach and Whitwam owed specific duties to PPG to assist the Board in overseeing any potential conflicts of interest as to related-party transactions, especially as to how that might impact the independence of the Board's purportedly "independent" outside directors.   The Nominating and Governance Committee failed in this regard by disregarding the following conflicts of interest that resulted in an entrenched Board where Board members' ability to oversee management was stymied due to their financial dealings with PPG's management:

- In addition to serving as a PPG Board member, defendant Berges is a partner at Clayton, Dubilier & Rice, LLC, a private investment firm with significant investments in companies that purchase and sell product to PPG.  On September 17, 2019, *Reuters* reported that Clayton, Dubilier & Rice, LLC was in discussions to form a consortium with PPG that would make an acquisition bid for coatings company Axalta Coating Systems Ltd.

- In addition to serving as a PPG Board member, defendant Richenhagen is the Chairman, President and CEO of AGCO Corporation.  During 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, and 2018, respectively, PPG and its subsidiaries sold approximately $1.9 million, $3.1 million, $3.8 million, $3.4 million, $3.6 million, $3.0 million, $2.9 million, $4.3 million, $4.2 million worth of coating products to AGCO Corporation.

- In addition to serving as a PPG Board member, defendant Lamach is the Chairman, President and CEO of Ingersoll-Rand plc.  During 2014, 2015, 2016, 2017, and 2018, respectively, PPG and its subsidiaries sold approximately $900,000, $4.0 million, $4.2 million, $4.1 million, and $4.2 million worth of coating products to Ingersoll-Rand.

- In addition to serving as a PPG Board member, defendant Angel is the CEO and a director of Linde plc.  During 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, and 2018, respectively, PPG and its subsidiaries purchased approximately $6.9 million, $6.1 million, $9.1 million, $8.6 million, $8.6 million, $7.4 million, $7.1 million, $2.4 million, and $2.4 million worth of industrial gases from Linde plc or its predecessors, Praxair, Inc. and Linde AG, and in 2010 and 2011, respectively, sold approximately

$21.4 million and $16.1 million worth of hydrogen and in 2010 sold $3.1 million of industrial and performance coatings to Praxair. Inc. Defendant Richenhagen is also a director of Linde plc and was a director of Praxair, Inc. from 2015 until the closing of its combination with Linde AG in October 2018 to form Linde plc.

- In addition to serving as a PPG Board member, defendant Grant was the Chairman and CEO of Monsanto Company until June 2018. During 2015 alone, PPG and its subsidiaries sold approximately $150,000 worth of coating products to Monsanto Company.

- In addition to serving as a PPG Board member, defendant Faraci is the retired Chairman and CEO of International Paper Company. During 2012, 2013, and 2014, respectively, PPG and its subsidiaries purchased approximately $4.6 million, $6.4 million, and $5.6 million worth of packaging products from International Paper, and in 2012 sold more than $29 million worth of commodity chemicals, fiber glass, coating products, and Teslin to International Paper. After defendant Faraci's retirement from International Paper in 2014, PPG discontinued reporting its transactions with International Paper, but defendant Faraci remains very financially dependent upon International Paper due to his ongoing financial interests in the firm.

- In addition to serving as a PPG Board member, defendant Mehrabian was the Chairman, President and CEO of Teledyne Technologies, Inc. During 2011, 2012, 2013, and 2014, respectively, PPG and its subsidiaries sold approximately $300,000, $140,000, $550,000, and $520,000 worth of sealants to Teledyne Technologies.

- On February 21, 2019, the PPG Board increased the size of the Board to 13 directors, effective as of April 18, 2019, and appointed Steven A. Davis and Catherine R. Smith to fill the vacancies subject to the approval of their appointment by the Company's shareholders at the 2019 Annual Meeting. In addition to serving as a PPG Board member, defendant Heminger is Chairman and CEO of Marathon Petroleum Corporation where Steven A. Davis serves as a board member, and in particular, serves on the compensation committee overseeing defendant Heminger's executive compensation. Likewise, in addition to serving as PPG Board members, defendants Healey and Hooper have served as members of the Target Corporation board of directors, where Catherine R. Smith has served as an Executive VP and CFO since 2015. As a member of the Target board's compensation committee, defendant Healey is charged with determining Catherine R. Smith's executive compensation.

46.     Each of the Defendants, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as

directors and/or officers of PPG, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Defendants who were also officers of the Company during the relevant period has been ratified by the Defendants who comprised PPG's Board during the relevant period.

## AIDING AND ABETTING AND CONCERTED ACTION

47.     In committing the wrongful acts alleged herein, Defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

48.     During all times relevant hereto, Defendants collectively and  individually initiated a course of conduct that was designed to and did: (i) cause and/or permit PPG to violate the Administrative Order and applicable environmental laws; (ii) conceal the fact that the Company was allowing its directors and senior officers to force PPG to misrepresent its financial results in violation of GAAP; (iii) artificially inflate the market price of PPG common stock by causing PPG to report those false financial results; (iv) cause PPG to overpay its executives due to the false and misleading financial reporting; (v) cause PPG to repurchase more than 15 million of its own shares on the open market at artificially inflated prices, overpaying for those shares by more than $132 million; (vi) expose the Company to hundreds of millions of dollars in potential civil and criminal liability to individuals, state and local governments, regulators and investors; (vii) maintain certain of the Defendants' executive and directorial positions at PPG and the profits, power and prestige Defendants enjoyed as a result of those positions; and (viii) deceive the investing public, including shareholders of PPG, regarding PPG's financial performance during the Restatement Period.

49.     The purpose and effect of Defendants' common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duties, abuse of control,

corporate waste, and unjust enrichment and to conceal adverse information concerning the Company's operational and financial condition in order to both justify the outsized executive compensation being paid to certain senior PPG executives and artificially inflate the price of PPG common stock, which allowed certain of the Defendants to dispose of millions of dollars' worth of their own PPG stock and enhance their executive and directorial positions and receive the substantial compensation they obtained as a result thereof.

50.     Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to both violate the Administrative Order and applicable environmental law; to purposefully and/or recklessly misrepresent PPG's financial results during the Restatement Period; to artificially inflate PPG's stock price to facilitate tens of millions of dollars of insider stock sales during the Restatement Period; to further buttress the stock price to facilitate those insider sales during the Restatement Period by causing PPG to repurchase tens of millions of dollars of its own common stock on the open market at inflated prices; and to pay certain senior PPG executives hundreds of millions of dollars in outsized executive compensation rather than requiring them to reimburse PPG for the potentially hundreds of millions of dollars in damages they caused it. Each of the Defendants was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

51.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**BACKGROUND**

52.     Pittsburgh Plate Glass Company was founded in 1883 by Captain John Baptiste Ford and John Pitcairn, Jr., at Creighton, Pennsylvania.

53.     Based in Creighton, Pennsylvania, PPG soon became the United States' first commercially successful producer of high-quality thick flat glass using the plate process.  PPG was also the world's first plate-glass plant to power its furnaces with locally produced natural gas, an innovation that rapidly stimulated widespread industrial use of the cleaner burning fuel.

54.     PPG expanded quickly.  By 1900, known as the "Glass Trust," PPG had ten plants, a 65% share of the U.S. plate-glass market, and had become the nation's second largest producer of paint.

55.     In December 1986, the Company changed its name to PPG Industries, Inc.

**DEFENDANTS CAUSED AND/OR PERMITTED PPG TO VIOLATE THE ADMINISTRATIVE ORDER AND APPLICABLE ENVIRONMENTAL LAWS**

56.     In the early 1900s, the PPG factory at Ford City, Pennsylvania, approximately 40 miles northeast of Pittsburgh, was the largest of its kind.  The plant used waste lagoons at a 150-acre dump site to collect slurry containing arsenic, lead, and other toxic metals.  PPG had established a solid waste disposal area on the site to dispose of off-spec glass and other solid wastes.  The plant closed in 1992, but the waste remained.

57.     The "PPG Dump," as it is now known, is still nearly 150 acres and includes 77 acres of waste slurry lagoons that sit on a terrace above the Allegheny River, elevated nearly 130 feet at their highest point.  Even after PPG stopped using the area for waste disposal, the Company failed to line or cover the old PPG Dump.  Over time, rain and snow-melt filtered through the soil, and, after mixing with or running through the waste, it became contaminated by pollutants including antimony, arsenic, and lead, and became highly alkaline.  The polluted water then seeped out of the slurry

lagoons and landfill at several locations. It then flowed to or was conveyed untreated to the Allegheny River and Glade Run.

58. On March 9, 2009, the Pennsylvania Department of Environmental Protection (the "DEP") issued an administrative order requiring that PPG collect and treat contaminated water discharging unabated from the PPG Dump containing waste from its former Ford City plant, and to restrict access to the site and to the section of the Allegheny River impacted by the discharge (the "Administrative Order"). In addition to undertaking efforts to monitor and abate the pollution, the Administrative Order expressly required that PPG submit a plan to the DEP detailing how it would limit access to the PPG Dump and to the affected areas of the Allegheny River and Glade Run.

59. However, as alleged in the complaint filed in the 2012 *PennEnvironment* Action, PPG failed to adequately redress the toxic runoff from the old PPG Dump as required by the Administrative Order, presenting an imminent and substantial endangerment to health and the environment. Specifically, while PPG claims to have developed an interim abatement system in 2010 designed to collect the base flow from the old PPG Dump and direct it to a treatment system, that system was only designed to accommodate a base flow of 12 gallons per minute, with all excess flow – which is common – discharging directly into the Allegheny River and Glade Run without treatment. Among other things, plaintiffs in the *PennEnvironment* Action have accused PPG of discharging pollutants, including arsenic, chromium, lead, manganese, copper, zinc, mercury, antimony, barium, beryllium, iron, vanadium, aluminum, total dissolved solids or salts, and semi-volatile organic compounds, as well as waste with high or low levels of pH, into wetlands without a permit. They have also charged PPG with committing at least 33 separate reporting violations and 162 separate discharge violations of the Administrative Order between February 2010 and December 2011 alone.

60.     On Friday, April 13, 2018, U.S. Magistrate Judge Robert Mitchell granted the plaintiffs in the *PennEnvironment* Action summary judgment, finding PPG liable under the federal RCRA for soil and water contamination that "may present an imminent and substantial endangerment to health or the environment."[2]  Runoff from slurry lagoons on the site contain high concentrations of lead, arsenic, chromium, manganese, salts and mercury.  Liquids seeping into the Allegheny River were so caustic, or alkaline, according to court filings that are part of the case history, that people coming into contact with it could be blinded and fish could not survive in the river near the site.  In addition to an order enjoining PPG from continuing to discharge pollution from the old PPG Dump, plaintiffs say they will seek an assessment of civil penalties for PPG's pollution and ongoing violations of the federal Clean Water Act.[3]

61.     In addition to causing PPG to violate the Administrative Order and state and federal environmental laws, Defendants violated PPG's own corporate governance policies.   PPG's corporate code of ethics mandated that "PPG [would] design, build and operate [its] facilities in ways that respect public health and the environment, conserve energy, water and raw materials, integrate pollution prevention and make a positive contribution to the surrounding community and to society as a whole" – a far cry from the violations amassed at the Ford City site.[4]

62.     In April 2019, PPG and the DEP entered into a consent order and agreement that incorporated PPG's approved cleanup plan and a draft final permit for the collection and discharge of seeps emanating from the PPG Dump.  The consent order included a civil penalty of $1.2 million for past unauthorized discharges.

---

[2]      Memorandum Opinion and Order, *PennEnvironment, et al.*, *vs. PPG Industries, Inc., et al.*, No. 12-342 (W.D. Pa. Apr. 13, 2018), ECF No. 331 at 48-49.

[3]      *See* Don Hopey, *Federal judge rules that PPG is liable for glass dump pollution*, Pittsburgh Post-Gazette, April 17, 2018.

[4]      *See* "Leadership Through Integrity - PPG Industries Global Code of Ethics - A Guide to Corporate Conduct."

63.     As a result of the gross misconduct of certain of PPG's current and former officers and directors, PPG is now exposed to substantial civil liability in the *PennEnvironment* Action, additional fines and penalties if penalized for violating the Administrative Order, and significant reputational harm.  Even if the *PennEnvironment* Action is unsuccessful and no additional regulatory charges are brought against PPG, the Company has nonetheless expended millions of dollars investigating and responding to the *PennEnvironment* Action, suffering significant monetary and reputational harm in the process.  As of December 31, 2018, PPG had $90 million reserved for environmental remediation efforts associated with the Ford City site, and PPG has acknowledged that it may be subject to additional $100 million to $200 million in loss contingencies related to environmental matters.  The Ford City site remediation would have cost less had it been executed in a timely and diligent fashion.

## DEFENDANTS PAID THEMSELVES EXCESSIVE COMPENSATION BASED ON ILLUSORY PROFITS INFLATED BY THE ENVIRONMENTAL LAW VIOLATIONS

64.     Defendants also breached their fiduciary duties, wasted corporate assets, and unjustly enriched themselves while they caused and/or failed to prevent PPG from undertaking the environmental law violations, which in turn allowed these faithless fiduciaries to justify their own outsized executive compensation and perquisites.  For example, the *Pittsburgh Post-Gazette* consistently ranked defendant Bunch, PPG's former CEO, as one of the highest, if not the highest, paid senior executives at a Pittsburgh-based publicly traded company – besting the senior executives at Mylan, Consol Energy, U.S. Steel, GNC and PNC Financial Services – every year up until his retirement, including in the years following the filing of the *PennEnvironment* Action in 2012.[5]

65.     Indeed, the PPG Board members consistently over-compensated the Officer Defendants throughout the past decade as PPG reported year after year of illusory "profits" derived

---

[5]     *See, e.g.,* Len Boselovic, *PPG leader tops list of top-paid executives – Fortunate 50*, Pittsburgh Post-Gazette, May 18, 2014.

in large part from their failure to comply with environmental laws and the Administrative Order.

Specifically, PPG reported net profits of $336 million on sales of $12.2 billion in 2009; net profits of

$769 million on sales of $13.4 billion in 2010; net profits of $1.1 billion on sales of $13.2 billion in

2011; net profits of $941 million on sales of $13.5 billion in 2012; net profits of 3.2 billion on sales

of $15.1 billion in 2013; net profits of $2.1 billion on sales of $14.8 billion in 2014; net profits of

$1.4 billion on sales of $14.8 billion in 2015; net profits of $873 million on sales of $14.3 billion in

2016; net profits of $1.6 billion on sales of $14.8 billion in 2017; and net profits of $1.3 billion on

sales of $15.4 billion in 2018.  Meanwhile, defendants Bunch, McGarry and Morales alone were

paid more than $193 million in executive compensation, much of that incentive-based, and all of that

approved by the Board and its Compensation Committee:

| DEFENDANT | YEAR | SALARY | STOCK | OPTIONS | CASH INCENTIVE COMPENSATION | TOTAL COMPENSATION (WITH OTHER) |
|---|---|---|---|---|---|---|
| BUNCH | 2009 | $1,050,000 | $2,718,100 | $949,200 | $1,500,000 | $8,422,427 |
| | 2010 | $1,075,000 | $4,034,100 | $1,870,400 | $2,800,000 | $12,386,000 |
| | 2011 | $1,145,833 | $4,071,672 | $1,833,588 | $3,200,000 | $14,327,716 |
| | 2012 | $1,280,000 | $5,066,681 | $2,533,602 | $4,000,000 | $17,891,543 |
| | 2013 | $1,350,833 | $5,066,660 | $2,533,586 | $4,188,000 | $16,913,230 |
| | 2014 | $1,393,333 | $5,335,141 | $2,666,904 | $3,750,000 | $21,628,081 |
| | 2015 | $1,441,667 | $6,000,053 | $2,999,852 | $3,300,000 | $29,998,373 |
| | 2016 | $966,667 | $3,359,596 | — | $1,700,000 | $7,379,611 |
| | | $9,703,333 | $35,652,003 | $15,387,132 | $24,438,000 | $128,946,981 |
| MCGARRY | 2010 | $317,500 | $437,988 | $200,400 | $500,000 | $1,776,397 |
| | 2011 | $375,000 | $422,533 | $190,278 | $650,000 | $2,257,544 |
| | 2012 | $442,500 | $716,317 | $357,762 | $720,000 | $3,000,077 |
| | 2013 | $541,666 | $833,321 | $416,708 | $900,000 | $3,056,995 |
| | 2014 | $614,583 | $1,366,826 | $683,393 | $1,100,000 | $5,551,240 |
| | 2015 | $845,833 | $1,533,378 | $766,610 | $1,400,000 | $5,958,869 |
| | 2016 | $1,100,000 | $4,666,753 | $2,333,538 | $2,100,000 | $12,468,674 |
| | 2017 | $1,212,500 | $5,000,022 | $2,500,015 | $1,855,600 | $14,249,861 |
| | 2018 | $1,258,333 | $5,334,995 | $2,666,347 | $1,160,000 | $11,784,404 |
| | | $6,707,915 | $20,312,133 | $10,115,051 | $10,385,600 | $60,104,061 |
| MORALES | 2017 | $483,333 | $518,123 | $266,490 | $500,000 | $2,389,098 |
| | 2018 | $562,500 | $866,866 | $433,287 | $190,000 | $2,336,266 |
| | | 1,045,833 | $1,384,989 | $699,777 | $690,000 | $4,725,364 |
| *Total* | | *$17,457,081* | *$57,349,125* | *$26,201,960* | *$35,513,600* | *$193,776,406* |

66.    Meanwhile, the PPG Board also compensated itself handsomely over the same time

period, paying themselves more than $23 million between 2009 and 2018 alone:

| YEAR | ANGEL | BERGES | FARACI | GRANT | HAYNES | HEALEY | HEMINGER |
|---|---|---|---|---|---|---|---|
| 2009 | | $210,020 | | $218,990 | $201,686 | | |
| 2010 | $8,333 | $200,009 | | $200,009 | $200,009 | | |
| 2011 | $200,054 | $200,054 | | $200,054 | $200,054 | | |
| 2012 | $240,033 | $236,033 | $23,500 | $259,033 | $230,033 | | |
| 2013 | $235,071 | $230,071 | $240,071 | $230,071 | $230,071 | | |
| 2014 | $275,036 | $250,036 | $250,036 | $280,036 | $250,036 | | |
| 2015 | $275,198 | $270,198 | $260,198 | $290,198 | $250,198 | | |
| 2016 | $285,091 | $290,091 | $280,091 | $300,091 | $270,091 | $195,211 | |
| 2017 | $295,103 | $290,103 | $280,103 | $290,103 | $270,103 | $279,867 | $195,587 |
| 2018 | $280,093 | $290,093 | $280,093 | $325,093 | $285,093 | $270,093 | $270,093 |
| *Total* | *$2,094,012* | *$2,466,708* | *$1,614,092* | *$2,593,678* | *$2,387,374* | *$745,171* | *$465,680* |

| YEAR | HOOPER | LAMACH | MEHRABIAN | RICHENHAGEN | RIPP | USHER | WHITWAM |
|---|---|---|---|---|---|---|---|
| 2009 | $225,020 | | $216,020 | $200,020 | $205,520 | $220,020 | $220,020 |
| 2010 | $215,009 | | $220,009 | $200,009 | $200,009 | $230,009 | $220,009 |
| 2011 | $239,939 | | $222,554 | $200,054 | $218,384 | $225,054 | $212,554 |
| 2012 | $260,033 | | $252,533 | $230,033 | $239,158 | $255,033 | $250,033 |
| 2013 | $260,071 | | $245,071 | $230,071 | $240,071 | $270,071 | $260,071 |
| 2014 | $290,036 | | | $250,036 | $10,000 | $270,036 | $10,000 |
| 2015 | $250,198 | $260,198 | | $250,198 | | $290,198 | |
| 2016 | $290,091 | $270,091 | | $270,091 | | $10,000 | |
| 2017 | $288,323 | $270,103 | | $290,103 | | | |
| 2018 | $270,093 | $270,093 | | $295,093 | | | |
| *Total* | *$2,588,813* | *$1,070,485* | *$1,156,187* | *$2,415,708* | *$1,113,142* | *$1,760,421* | *$1,172,687* |

## DEFENDANTS INFLATE THE MARKET PRICE OF PPG COMMON STOCK BY FALSIFYING PPG'S FINANCIAL REPORTS DURING THE RESTATEMENT PERIOD

67.     During the Restatement Period, Defendants caused PPG common stock to trade at artificially inflated levels by issuing a series of materially false and misleading statements regarding the Company's financial results, business and prospects. Specifically, Defendants caused or allowed PPG to issue materially false and misleading financial statements that failed to disclose or misstated the following: (i) that Defendants were causing PPG to improperly delay recognition of certain expenses and misclassify certain categories of income, in violation of GAAP, thereby moving expenses from a troubled quarter to one where the Company was performing strongly and in that

way "smoothing" PPG's financials so it would appear that the Company was consistently meeting expectations; and (ii) that the Company's internal reporting controls were defective and preventing it from issuing accurate financial reports and projections.

68.     Specifically, this action arises out of the scheme of PPG's former VP, Controller, and Principal Accounting Officer, defendant Kelly, to manipulate the Company's financial metrics in order meet Wall Street analysts' expectations.  Defendant Kelly, with help from certain insiders, employed a variety of improper accounting techniques to, among other things, delay recognition of certain expenses and misclassify certain categories of income.  The intentional falsification of PPG's financial results was facilitated by the defects in PPG's internal reporting controls.  By employing falsified measures during the Restatement Period, defendant Kelly moved expenses from a troubled quarter to one where the Company was performing strongly and in that way "smoothed" PPG's financials so it would appear that the Company was consistently meeting expectations.  Due to the Company's ineffective and inadequate internal controls, defendant Kelly was able to pursue his scheme for nearly a year and a half without notice.

**Defendants' Falsification of PPG's Financial Reporting**

69.     On January 19, 2017, Defendants caused PPG to announce its fourth quarter and full-year results for fiscal 2016, ended December 31, 2016 ("4Q16" and "FY16").  For the 4Q16, the Company reported adjusted net income from continuing operations of $313 million and claimed that adjusted earnings per diluted share were $1.19, an increase of 3%.  For FY16, PPG reported adjusted net income from continuing operations of $1.55 billion, or $5.82 per diluted share, an increase of 7% over the previous year.  The release stated in pertinent part as follows:

- Fourth quarter net sales of $3.5 billion and reported earnings per diluted share from continuing operations of 29 cents

- Fourth quarter adjusted earnings per diluted share from continuing operations of $1.19, up approximately 3 percent including unfavorable impact from foreign currency translation

- Initiated new restructuring program targeting $125 million in annual cost savings, including savings of $40 million to $50 million in 2017

- Continued portfolio optimization with announced acquisition of two European architectural coatings businesses along with divestitures of several non-core glass businesses

- Achieved top-end of cash deployment target for acquisitions and share repurchases, deploying over $2.5 billion in 2015-2016 combined

- Strong financial flexibility remains with cash and short-term investments totaling approximately $1.9 billion at year-end

\*      \*      \*

Fourth quarter 2016 reported net income from continuing operations was $77 million, or 29 cents per diluted share. Adjusted net income from continuing operations was $313 million, or $1.19 per diluted share. Adjusted net income excludes after-tax charges totaling $236 million, or 90 cents per diluted share. These after-tax charges include: $146 million for business restructuring; $51 million for increases to legacy environmental reserves; $23 million for tax true-ups related to asbestos settlement funding; $5 million for a premium on the early retirement of debt; and $44 million for the loss on the sale of the European fiber glass business offset by a $33 million net gain on the disposals of ownership interests in business affiliates. For the fourth quarter 2016, the effective tax rate was 42.1 percent and the adjusted effective tax rate was 24.5 percent.

Fourth quarter 2015 reported net income from continuing operations was $295 million, or $1.09 per diluted share. Fourth quarter 2015 adjusted net income from continuing operations was $313 million, or $1.16 per diluted share and excluded an after-tax charge for transaction-related costs of $11 million, or 4 cents per diluted share, and an equity affiliate debt-refinancing charge of $7 million, or 3 cents per diluted share. The effective tax rate was 23.3 percent for the fourth quarter 2015, and the adjusted effective tax rate for the quarter was 24.2 percent.

Financial results from the divested flat glass business are presented as discontinued operations for all periods, including a fourth quarter 2016 gain of $1.01 per diluted share from the business divestiture. Historical financial results of the divested fiber glass businesses are included in the Glass segment.

"We delivered fourth quarter and full-year adjusted earnings-per-diluted-share growth despite modest and uneven global economic growth and the impact of significant unfavorable foreign currency translation," said Michael H. McGarry, PPG chairman and chief executive officer. "We achieved these milestones due to improving sales volumes, continued aggressive cost management and ongoing earnings-accretive focused cash deployment.

"For the fourth quarter, our adjusted earnings per diluted share increased by 3 percent, aided by coatings volume growth of nearly 2 percent and despite significant

currency translation headwinds," McGarry said.  "We achieved our highest volume growth in emerging regions, and by segment our Industrial Coatings grew global volumes by 5 percent with each business unit realizing similar growth rates.  Global sales volumes declined less than 1 percent in Performance Coatings, as automotive refinish and architectural coatings growth was more than offset by lower protective and marine coatings demand stemming from further weakness in marine ship builds.

"For the full year, in addition to 7 percent adjusted earnings-per-share growth, we completed a variety of strategic actions to strengthen our company," McGarry said.

\*       \*       \*

Full-year 2016 net sales from continuing operations were $14.8 billion, consistent with the prior year including an unfavorable foreign currency translation impact of nearly 3 percent, or approximately $400 million.  Sales volume growth of 1 percent versus the prior year was supplemented by acquisition-related sales growth of nearly 2 percent, net of sales divested with the European fiber glass business.

The company's 2016 full-year reported net income from continuing operations was $564 million, or $2.11 per diluted share, versus $1.34 billion, or $4.89 per diluted share, in 2015.  Full-year 2016 adjusted net income from continuing operations was $1.55 billion, or $5.82 per diluted share, versus $1.49 billion, or $5.43 per diluted share, in 2015, representing an adjusted-earnings-per-diluted-share increase of 7 percent.  In 2016, foreign currency translation unfavorably impacted pre-tax income by approximately $70 million.  The effective tax rate from continuing operations was 29.1 percent for 2016, versus 23.8 percent for 2015, and the adjusted effective tax rate from continuing operations was 24.5 percent for 2016, versus 24.1 percent for 2015.

70.     On February 16, 2017, Defendants caused PPG to file its Annual Report on Form 10-K with the SEC for the fiscal year ended December 31, 2016 (the "FY16 10-K").  The FY16 10-K was signed by defendants McGarry, Angel, Berges, Faraci, Grant, Haynes, Healey, Hooper, Lamach, and Richenhagen, and certified as to its veracity pursuant to the Sarbanes Oxley Act of 2002 ("SOX") by defendant McGarry.  The FY16 10-K reiterated the Company's "smoothed" financial results announced on January 19, 2017.  In particular, for FY16, PPG reported in the FY16 10-K: (i) adjusted net income from continuing operations of $1.548 billion; (ii) adjusted earnings per diluted share from continuing operations of $5.82; (iii) net income from continuing operations of $564 million; (iv) net income per diluted share from continuing operations of $2.11; (v) net income of $877 million; (vi) unallocated corporate expenses of $207 million; (vii) a business restructuring

charge of $197 million; (viii) selling, general, and administrative expenses of $3.662 billion, which

included total stock-based compensation of $39 million; and (ix) other income of $176 million.

Further, defendants McGarry, Angel, Berges, Faraci, Grant, Haynes, Healey, Hooper, Lamach, and

Richenhagen claimed in the FY16 10-K that the statements were prepared in accordance with GAAP

and that the Company maintained effective internal controls over financial reporting.  The FY16 10-

K stated in pertinent part as follows:

> We are responsible for the preparation of the financial statements included in
> this Annual Report. The financial statements were prepared in accordance with
> accounting principles generally accepted in the United States of America and include
> amounts that are based on the best estimates and judgments of management.
>
> *       *       *
>
> Our evaluation included reviewing the documentation of our controls, evaluating the
> design effectiveness of our controls and testing their operating effectiveness.  Based
> on this evaluation we have concluded that, as of December 31, 2016, the Company's
> internal controls over financial reporting were effective.

71.     On April 20, 2017, Defendants caused PPG to issue a press release announcing its

financial results for the first quarter of 2017 ("1Q17") ended March 31, 2017.  Defendant McGarry

was quoted in the release emphasizing that PPG's adjusted earnings per diluted share increased by

more than 6% in 1Q17, reaching $1.35.  The release disclosed the additional key metrics for the

1Q17: (i) adjusted net income from continuing operations of $351 million; (ii) net income from

continuing operations of $334 million; (iii) net income per diluted share from continuing operations

of $1.29; (iv) net income of $334 million; (v) net sales of $3.569 billion; (vi) selling, general and

administrative expenses of $896 million; and (vii) other income of $11 million, net of other charges.

The release further stated in pertinent part as follows:

> PPG today reported first quarter 2017 net sales of about $3.6 billion, up 1
> percent versus the prior year.  Net sales in local currencies grew nearly 3 percent
> year-over-year, aided by sales volume growth of 2 percent.  The net impact from
> business portfolio actions contributed less than 1 percent to net sales, as acquisition-
> related net sales modestly exceeded divested net sales stemming from the sale of the
> European fiber glass business in October 2016.  Selling prices were flat, an

- 34 -

improvement versus prior sequential quarters. Unfavorable foreign currency translation impacted net sales by nearly 2 percent, or about $65 million.

First quarter 2017 net income from continuing operations was $334 million, or $1.29 per diluted share. First quarter 2017 adjusted net income from continuing operations was $351 million, or $1.35 per diluted share. Adjusted net income excludes an after-tax pension settlement charge of $14 million, or 5 cents per diluted share, and after-tax transaction-related costs of $3 million, or 1 cent per diluted share. The effective tax rate for the quarter was 24.3 percent, and the adjusted effective tax rate for the quarter was 25.0 percent.

First quarter 2016 net income from continuing operations was $337 million, or $1.25 per diluted share. First quarter 2016 adjusted net income from continuing operations was $341 million, or $1.27 per diluted share. Adjusted net income excluded after-tax charges totaling $4 million, or 2 cents per diluted share, for transaction-related costs and an asset write-down charge. The effective tax rate for the quarter was 24.6 percent, and the adjusted effective tax rate for the quarter was 24.7 percent.

"We continued to deliver higher year-over-year adjusted earnings per diluted share, increasing by more than 6 percent in the first quarter. This growth was despite moderate but uneven global market demand and the unfavorable impact from foreign currency translation," said Michael McGarry, PPG chairman and chief executive officer. "Our earnings-per-share growth rate improved versus the fourth quarter 2016, benefiting from our ongoing cash deployment, sales volume growth and continued cost discipline, but negatively impacted by increasing raw material costs, which we partially offset with our initial pricing actions," McGarry said.

72.     On April 24, 2017, Defendants caused PPG to file its 1Q17 Quarterly Report on Form 10-Q with the SEC (the "1Q17 10-Q"). The 1Q17 10-Q, which was signed and certified pursuant to SOX by defendants McGarry and Morales, contained financial results similar to those released on April 20, 2017, except that it separately reported other income of $25 million and other charges of $14 million. The April 20, 2017 release combined these two amounts. The 1Q17 10-Q repeated the incorrect statement that the financial statements complied with GAAP and followed SEC reporting requirements. The 1Q17 10-Q also stated that PPG's disclosures controls and procedures were effective.

73.     On July 20, 2017, Defendants caused PPG to issue a press release announcing its results for the second quarter of 2017 ("2Q17") ended June 30, 2017. Once again, as defendant McGarry emphasized in the press release, the Company's adjusted earnings per diluted share

increased 6% year-over-year, reaching $1.83.   The release quoted defendant McGarry, who highlighted the Company's "aggressive cost management."  Other key financial results announced in the press release included: (i) adjusted net income from continuing operations of $472 million; (ii) net income from continuing operations of $504 million; (iii) net income per diluted share from continuing operations of $1.95; (iv) net income of $501 million; (v) net sales of $3.806 billion; (vi) selling, general and administrative expenses of $865 million; and (vii) a loss from discontinued operations of $3 million.  Notably, the release claimed that "[a]ll figures presented for the current and prior year have been recast to reflect PPG's former Glass segment as discontinued operations."

74.     On July 21, 2017, Defendants caused PPG to reiterate these results in its 2Q17 Quarterly Report on Form 10-Q filed with the SEC (the "2Q17 10-Q").  The 2Q17 10-Q, signed and certified pursuant to SOX by defendants McGarry and Morales, also reported "other" income of $72 million.  Like the 1Q17 10-Q, the 2Q17 10-Q claimed that "[t]he condensed consolidated financial statements included herein . . . have been prepared following the requirements of the Securities and Exchange Commission and accounting principles generally accepted in the United States of America," and that the Company's controls and procedures were effective.

75.     On October 19, 2017, Defendants caused PPG to issue a press release announcing its financial results for the third quarter of 2017 ("3Q17") ended September 30, 2017.  The key financial metrics disclosed in the press releases were: (i) adjusted net income from continuing operations of $392 million; (ii) adjusted earnings per diluted share from continuing operations of $1.52; (iii) net income from continuing operations of $392 million; (iv) net income per diluted share from continuing operations of $1.52; (v) net income of $609 million; (vi) cost of sales of $2.1 billion; and (vii) selling, general and administrative expenses of $905 million.

76.     On October 20, 2017, Defendants caused PPG to file its 3Q17 Quarterly Report on Form 10-Q with the SEC (the "3Q17 10-Q").  The 3Q17 10-Q, signed and certified as to veracity

under SOX by defendants McGarry and Morales, reiterated the financial results provided in the October 19, 2017 release.  In addition, the 3Q17 10-Q claimed that "[t]he condensed consolidated financial statements included herein . . . have been prepared following the requirements of the Securities and Exchange Commission and accounting principles generally accepted in the United States of America."  The 3Q17 10-Q also contained a statement that the Company's internal disclosures controls and procedures were reviewed and effective.

77.     On January 18, 2018, Defendants caused PPG to issue a press release announcing its fourth quarter and full year results for the 2017 fiscal year ("4Q17" and "FY17") ended December 31, 2018.  The release quoted defendant McGarry, who highlighted the Company's adjusted earnings per diluted share growth and cost savings, stating in pertinent part as follows:

> "For the full year, we delivered adjusted earnings per diluted share growth despite repeated disruptions to the coatings industry supply chain that resulted in significant coatings raw material inflation.  We continued our legacy of aggressively managing our cost structure and delivered $50 million of full year cost savings from our 2016 restructuring program, achieving the top-end of our target.  Strategically, during 2017 we completed our multi-year portfolio transformation with the sale of the U.S. fiber glass business, our last remaining non-core business, and continued our earnings-accretive focused cash deployment."

78.     According to the January 18, 2018 release, PPG's financial results for 4Q17 were: (i) adjusted net income from continuing operations of $304 million; (ii) adjusted earnings per diluted share from continuing operations of $1.19; (iii) net income from continuing operations of $184 million; (iv) net income per diluted share from continuing operations of $0.72; (v) net income of $184 million; (vi) cost of sales of $2.117 billion; (vii) selling, general and administrative expenses of $912 million; and (viii) other income of $17 million, net of other charges.  According to the release, PPG's financial results for FY17 were: (i) adjusted net income from continuing operations of $1.513 billion; (ii) adjusted earnings per diluted share from continuing operations of $5.87; (iii) net income from continuing operations of $1.408 billion; (iv) net income per diluted share from continuing operations of $5.46; (v) net income of $1.628 billion; (vi) net sales of $14.750 billion; (vii) cost of

sales of $8.204 billion; (viii) selling, general and administrative expenses of $3.570 billion; (ix) other income of $90 million, net of other charges; and (x) income from discontinued operations of $220 million.

79.   On February 15, 2018, Defendants caused the Company to file its FY17 Annual Report on Form 10-K with the SEC (the "FY17 10-K"). The FY17 10-K was signed by defendants McGarry, Morales, Kelly, Angel, Berges, Faraci, Grant, Haynes, Healey, Heminger, Hooper, Lamach, and Richenhagen, and certified as to its veracity pursuant to SOX by defendants McGarry and Morales. The FY17 10-K reiterated the financial results discussed above for FY17, except for the following changes due to a $37 million higher net charge than what was announced in the January 18, 2018 release as "related to the enactment of the U.S. Tax Cuts and Jobs Act": (i) adjusted net income from continuing operations of $1.513 billion; (ii) net income from continuing operations of $1.371 billion; (iii) net income per diluted share from continuing operations of $5.32; and (iv) net income of $1.591 billion. In addition, the breakdown between other income and other charges was detailed, with PPG reporting other charges of $64 million and other income of $154 million for FY17. The FY17 10-K also revised the following financial results for 4Q17 due to a $37 million higher net charge than that announced in the January 18, 2018 release "related to the enactment of the U.S. Tax Cuts and Jobs Act": (i) net income from continuing operations of $147 million; (ii) net income per diluted share from continuing operations of $0.58; and (iii) net income of $147 million. The FY17 10-K also claimed that the Company's financial results were prepared in accordance with GAAP and that the Company's internal controls over financial reporting were effective.

80.   The statements referenced above were each materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts, which Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     That PPG's financial results were materially misstated because of defendant Kelly's illicit earnings management scheme and improper accounting entries and the remaining Defendants' failure to implement effective internal controls, including, among other matters, misstating adjusted net income from continuing operations, adjusted net income from continuing operations per diluted share, net income from continuing operations, net income from continuing operations per diluted share, net sales, other income, net income, and PPG's amortization and selling, general and administrative expenses;

(b)     That PPG's financial results and statements were not presented in accordance with GAAP and that those financial statements/results were materially misstated because of defendant Kelly's illicit earnings management scheme and improper accounting entries;

(c)     That PPG's internal controls over financial reporting were not effective as of the time these statements were issued and a material weakness existed in the Company's internal control over financial reporting; and

(d)     That defendant Kelly "directed his subordinates to improperly override the Company's internal controls during the Company's financial close process, which directions were followed and not disclosed to others in senior management, the Audit Committee or the Company's independent registered public accounting firm and not otherwise detected by the Company's internal controls."

(e)     That PPG's internal reporting controls were so woefully defective that a single individual, defendant Kelly, was able to unilaterally override them and manipulate the Company's publicly reported results for nearly a year and half without detection, despite Defendants having falsely claimed all the while that PPG was being operated with effective reporting controls designed to preclude this very misconduct.

**The Truth Is Revealed**

81.     The true state of PPG's business metrics and financial prospects and Defendants'
wrongdoing began to emerge on April 19, 2018 when PPG issued a press release announcing the
results for the first quarter of fiscal 2018.  In the press release, PPG announced: (i) adjusted net
income from continuing operations of $350 million; (ii) adjusted earnings per diluted share from
continuing operations of $1.39; (iii) net income from continuing operations of $347 million; (iv) net
income per diluted share from continuing operations of $1.38; (v) net income of $353 million; (vi)
selling, general and administrative expenses of $903 million; and (vii) an amortization expense of
$34 million.

82.     The April 19, 2018 release disclosed the first hints of defendant Kelly's scheme,
though they were presented in a misleading light to continue the subterfuge.  In particular, the April
19, 2018 release stated in pertinent part as follows:

> As PPG's earnings release was being finalized, the company received a report
> through its internal reporting system concerning potential violations of PPG's
> accounting policies and procedures regarding the failure to accrue certain specified
> expenses in the first quarter.  Based on preliminary review, the company identified
> approximately $1.4 million of expense that should have been accrued in the first
> quarter, and the earnings reported in this release reflect the accrual of such $1.4
> million of expenses.  The report also alleges that there may have been other
> unspecified expenses, potentially up to $5 million in the aggregate, that were
> improperly not accrued in the first quarter.

83.     The release further disclosed that the Audit Committee of the PPG Board would
conduct an investigation into the potential accounting violations.

84.     On May 10, 2018, PPG issued a press release providing an update on the status of the
Audit Committee's investigation.  The press release explained that PPG's Audit Committee found
evidence that improper accounting entries were made by certain employees at the direction of
defendant Kelly.  As a result, the Company announced that its financial statements for FY17 and the
quarterly reports during that year should no longer be relied upon and that the Company was unable
to timely file its quarterly report for 1Q18.

85.     According to the May 10, 2018 release, the Audit Committee investigation had identified the following matters relating to the financial periods in 2017: (i) improper reclassifications of gains from income from discontinued operations to income from continuing operations of $2.1 million and $4.7 million, pre-tax, for 2Q17 and 4Q17, respectively; and (ii) improper shifting of expenses from one quarter to other quarters, resulting in $6.9 million in expenses that should have been reported in 2Q17, but were instead shifted to 3Q17 and 4Q17.  In the May 10, 2018 release, PPG separately noted that, apart from the investigation, the Company had identified certain inadvertent errors with respect to 1Q18 resulting in a net decrease of income from continuing operations of $7.8 million, pre-tax.

86.     On this news of the intentional manipulation of the Company's financial results, PPG's market capitalization dropped over $1.4 billion on May 11, 2018, declining from $26.5 billion to just under $25.1 billion. The Company's market capitalization would continue to slide to under $25.1 billion from a relevant period market capitalization high of nearly $31 billion on January 26, 2018, a drop of nearly 19%.

87.     On June 28, 2018, PPG announced that its Audit Committee had completed the investigation and the Company needed to restate its financial results.  In particular, PPG was restating its audited consolidated financial statements for the years ended December 31, 2016 and 2017 (and the unaudited quarterly results for the quarters ended December 31, 2016, March 31, 2017, June 30, 2017, September 30, 2017, and December 31, 2017).  PPG also announced that it was issuing corrected financial results for the quarter ended March 31, 2018, as compared to the results for that quarter that had previously been issued in the Company's April 19, 2018 press release.

88.     The June 28, 2018 release further stated that PPG had concluded that its "consolidated financial statements for the year ended December 31, 2016 included in the Original Filing and the related report of [PPG's independent registered public accounting firm,

PricewaterhouseCoopers LLP], and for the final quarterly and year-to-date period in 2016, should no longer be relied upon because of certain misstatements contained in those financial statements."

89.     On June 28, 2018, PPG also filed with the SEC an amended FY17 10-K ("FY17 10-K/A") and PPG's belated Quarterly Report on Form 10-Q for the first quarter ended March 31, 2018 (the "1Q18 10-Q" and, together with the FY17 10-K/A, the "Restatement").   As part of the Restatement, PPG included an explanatory note in the FY17 10-K/A detailing the background of the Restatement and the Audit Committee investigation.   The investigation had identified numerous categories of misstatements in the originally reported financial results for FY16 and FY17, and for 1Q17, 2Q17, 3Q17 and 1Q18.   As a result of the investigation, the following changes to the Company's financial statements were required:

(a)     for 4Q16 and FY16, net income from continuing operations decreased by $4 million, or $0.01 per diluted share;

(b)     for 1Q17, net income from continuing operations increased by $3 million, or $0.01 per diluted share;

(c)     for 2Q17, net income from continuing operations decreased by $7 million, or $0.03 per diluted share;

(d)     for 3Q17, net income from continuing operations increased by $1 million, or less than $0.01 per diluted share;

(e)     for 4Q17, net income from continuing operations increased by $1 million, or less than $0.01 per diluted share;

(f)     for FY17, net income from continuing operations decreased by $2 million, or $0.01 per diluted share; and

(g)     for 1Q18, net income from continuing operations increased by $0.3 million, prior to taxes.

90. In addition, as part of the Restatement, the Company reevaluated its internal controls and found that they were ineffective and that there were material weaknesses in the internal controls as of December 31, 2016, March 31, 2017, June 30, 2017, September 30, 2017, and December 31, 2017.

91. In the wake of these disclosure, the price of PPG's stock plunged to as low as $101.17 per share by July 2, 2018, over 17% below the stock's Restatement Period high of $122.07 per share in intraday trading on January 18, 2018. With PPG having approximately 243.5 million shares outstanding on June 28, 2018, this drop represented a market capitalization loss for PPG of more than $5 billion.

**Defendants Caused PPG to Repurchase Stock at Fraud-Inflated Prices During the Restatement Period**

92. Defendants were incentivized to misstate PPG's reported financial results, thus causing its stock to trade at fraud-inflated prices, in order to increase their executive compensation. According to the Company's 2017 and 2018 Annual Proxy Statements:

> [T]he amount of an executive's actual annual incentive award, in relation to the executive's target opportunity, is determined on the basis of achievement of short-term performance objectives. The performance objectives for our Chairman and Chief Executive Officer, our retired Executive Chairman, our Chief Financial Officer and our Senior Vice President and General Counsel include specific financial targets for Company performance (weighted 70%) and personal performance (weighted 30%). The performance objectives for our other executive officers include specific financial targets for Company performance (weighted 20%), business performance (weighted 50%) and personal performance (weighted 30%).

As a result of their misstatements, Defendants were rewarded handsomely during the Restatement Period, as detailed in ¶¶65-66.

93. At the same time that Defendants were issuing these materially false and misleading statements and causing the price of PPG common stock to trade at artificially inflated prices, the PPG Board approved a new stock buy-back program in January 2017 and caused PPG to purchase $813 million worth of PPG shares on the open market in FY17 and more than $1.7 billion worth of

PPG shares on the open market in FY18. As a result of Defendants' misstatements, PPG paid artificially inflated market prices when it repurchased more than 15 million shares on the open market during the Restatement Period, thereby causing PPG to overpay an estimated more than $132 million for those shares as follows:

| MONTH ENDED | SHARES REPURCHASED | AVERAGE PRICE PAID PER SHARE | ESTIMATED OVERPAYMENT[6] |
|---|---|---|---|
| 7/31/17 | 434,820 | $109.51 | $2,969,821 |
| 8/30/17 | 769,597 | $103.64 | $738,813 |
| 9/30/17 | 1,149,396 | $106.68 | $4,597,584 |
| 10/31/17 | 1,221,668 | $114.35 | $14,256,866 |
| 11/30/17 | 1,152,976 | $115.64 | $14,942,569 |
| 12/31/17 | 1,091,300 | $116.36 | $14,928,984 |
| 1/31/18 | 1,456,679 | $118.21 | $22,622,225 |
| 2/28/18 | 1,352,259 | $115.19 | $16,916,760 |
| 3/31/18 | 2,396,012 | $113.62 | $26,212,371 |
| 4/30/18 | 1,383,817 | $109.66 | $9,659,043 |
| 5/31/18 | 1,526,907 | $104.19 | $2,305,630 |
| 06/30/18 | 1,457,280 | $104.06 | $2,011,046 |
| | *15,392,711* | | *$132,161,711* |

**Significant Damage to PPG Arising from the Accounting Misstatements**

94.      Soon after disclosing the Company's accounting misstatements, investors sued PPG, defendants McGarry, Morales, and Kelly for securities fraud in the U.S. District Court for the Central District of California. The defendants in the securities class action moved to dismiss that action on October 5, 2018. Judge R. Gary Klausner denied the defendants' motion on December 21, 2018. In doing so, Judge Klausner rejected that the improper statements detailed above were not material, pointing out in particular that the Company had a reputation of being able to meet or exceed expectations and that defendant Kelly's smoothing scheme allowed PPG to report adjusted earnings per share that outperformed consensus estimates. In particular, the Court stated in pertinent part as follows:

---

[6]      Based on the July 2, 2018 market closing price of PPG common stock at $102.68.

For example, PPG initially reported an adjusted EPS of $1.19 for the fourth quarter of 2016, which outperformed the consensus estimate of $1.18. (FAC ¶ 38.) Following the Restatement, however, the adjusted EPS for the fourth quarter of 2016 was below the consensus estimate at $1.17. (Id.) Likewise, PPG initially reported an adjusted EPS of $1.83 for the second quarter of 2017, surpassing consensus estimates of $1.82, but the it actual adjusted EPS was $1.80 after the misstatements were corrected. (FAC ¶¶ 40, 43.) Plaintiffs assert that PPG had a reputation for consistently meeting or exceeding consensus estimates, (FAC ¶ 30-31), that adjusted EPS is one of the key financial metrics upon which PPG's securities analysts focus, (FAC ¶ 28), and that it is a metric "highlighted prominently in each of PPG's earning releases" (FAC ¶ 37). . . . Accordingly, the Court find that Plaintiffs adequately allege that the misstatements were material.

95.     The Court also held that the defendants acted with scienter and that defendant Kelly's scienter could be imputed to PPG. As a result, the parties entered into the discovery phase of the litigation.

96.     On June 2, 2019, the parties in the Securities Fraud Class Action filed settlement papers with the Court, revealing that they agreed to settle the matter for $25 million.

97.     In addition, the Company has announced that both the SEC and the DOJ are investigating it as a result of the improper statements described herein.

98.     The scheme has also cost the Company millions of dollar a quarter. According to PPG's filings with the SEC, the Company had spent at least $18 million on the accounting investigation through June 30, 2018, and the Company will continue to incur costs as it responds to the SEC and DOJ investigations.

99.     As a result of the Defendants' improprieties, PPG disseminated improper public statements. These improper statements have devastated PPG's credibility as reflected by the Company's massive market capitalization loss.

100.     PPG's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, PPG's current and potential customers consider a company's ability to have effective internal controls and provide accurate financial reports to the market. PPG's ability to raise equity capital or debt on favorable terms in the future is now

impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by Defendants have materially increased the perceived risks of investing in and lending money to the Company.

101.    Further, as a direct and proximate result of Defendants' actions, PPG has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending against and paying the settlement in the Securities Fraud Class Action, including any insurance deductibles and an increase in insurance expenses;

(b)    costs incurred from the Audit Committee's investigation;

(c)    costs incurred from responding to and defending against the DOJ and SEC investigations; and

(d)    costs incurred from compensation and benefits paid to the Defendants who have breached their duties to PPG.

## DERIVATIVE AND DEMAND MADE ALLEGATIONS

102.    Plaintiffs bring this action derivatively in the right and for the benefit of PPG to redress injuries suffered and to be suffered by PPG as a direct result of Defendants' violations of state and federal law, breaches of fiduciary duties, abuse of control, corporate waste, and unjust enrichment, as well as the aiding and abetting thereof.  This is not a collusive action to confer jurisdiction on this Court, which it would not otherwise have.

103.    Plaintiffs will adequately and fairly represent the interests of PPG and its shareholders in enforcing and prosecuting its rights.

104.    Plaintiffs are owners of PPG stock and were owners of PPG stock during times relevant to Defendants' illegal and wrongful course of conduct alleged herein.

105.     As detailed above at ¶¶6-7 and in Exhibits A, F and H, by means of letters dated April 30, 2018, August 6, 2018 and August 23, 2018, plaintiffs made two separate litigation demands on the Board (the "Environmental Law Violation Demand" and "Accounting Misstatement Demand," and together the "Demands").  In the Demands, plaintiffs explained that the Defendants breached their fiduciary duties to the Company and violated the federal securities laws, as detailed herein, and demanded that the Board remedy the wrongdoing, including commencing legal proceedings against those responsible.

106.     And as detailed above at ¶¶8-9 and Exhibits J, K and L, the PPG Board has not responded to these Demands, constructively rejecting them.

107.     Pennsylvania has adopted certain sections of the American Law Institute Principles of Corporate Governance: Analysis and Recommendations ("ALI Principles").  Concerning derivative actions, Pennsylvania has specifically adopted ALI Principles §§7.02-7.10 and 7.13.  *Cuker v. Mikalauskas*, 692 A.2d 1042, 1049-50 (Pa. 1997).

108.     ALI Principles §7.03 addresses the requirement that stockholders make a demand on the Board before instituting a derivative action.  In particular, §7.03 states, in relevant part:

(a)     Before commencing a derivative action, a holder or a director should be required to make a written demand upon the board of directors of the corporation, requesting it to prosecute the action or take suitable corrective measures, unless demand is excused under § 7.03(b).  The demand should give notice to the board, with reasonable specificity, of the essential facts relied upon to support each of the claims made therein.

*             *             *

(c)     Demand on shareholders should not be required.

(d)     Except as provided in § 7.03(b), the court should dismiss a derivative action that is commenced prior to the response of the board or a committee thereof to the demand required by § 7.03(a), unless the board or committee fails to respond within a reasonable time.

109.     Here, the Board has failed to respond to either of plaintiffs' Demands in a reasonable time.  Nearly two years have passed since plaintiffs' counsel sent the Environmental Law Violation

Demand to the Board and a year and a half has transpired since plaintiffs' counsel sent the Accounting Misstatement Demand. Comment (f) to ALI Principles §7.03 provides sixty days as an example of a reasonable amount of time to respond, and explicitly states that a delay of six months or more "would often prejudice the plaintiff." The comment continues that, "[i]f the corporation fails to undertake and complete its inquiry within a reasonable period following demand (which period should never exceed several months even when a study is undertaken and seldom should be that long), the plaintiff may file the action, and it should not be deemed premature." The Board's inquiry has improperly lasted more than several months.

110.    In addition, despite the fact that the Securities Fraud Class Action has settled, the SLC shows no sign of concluding its investigation in the near future, and instead the Board recently appointed new directors to the SLC. Accordingly, plaintiffs have satisfied Pennsylvania's demand requirement, and may pursue this action on behalf of the Company.

111.    Plaintiffs have not made any demand on shareholders of PPG to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    PPG is a publicly traded company with more than 236 million shares outstanding, and thousands of shareholders;

(b)    making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    making demand on all shareholders would force plaintiffs to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### For Violations of §10(b) and Rule 10b-5 of the Exchange Act
### Against the Officer Defendants

112.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

113.    Throughout the Restatement Period, the Officer Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify PPG's financial reporting.

114.    The Officer Defendants employed devices, schemes and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material fact and/or omitting to state material facts necessary in order to make the statements made about PPG not misleading.

115.    The Officer Defendants, as top executive officers and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company, each of the Officer Defendants was able to and did control the conduct complained of herein and the content of the public statements disseminated by PPG.

116.    The Officer Defendants acted with scienter throughout the relevant period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  Specifically, under GAAP, a "restatement" is a term of art used only where a company's previously issued financial statements were materially false as of the time of issuance and the misstatements were based on "facts that existed at the time the financial statements were prepared."  In this case, PPG issued a broad

restatement based on actual misconduct facilitated by its lack of internal controls.  The Officer Defendants were among the senior management of the Company, and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.

117.    Each of the Officer Defendants participated in a scheme to defraud with the purpose and effect of defrauding PPG.

118.    By virtue of the foregoing, the Officer Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of §20(a) of the Exchange Act Against
### the Officer Defendants

119.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

120.    The Officer Defendants, by virtue of their positions with PPG and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of PPG within the meaning of §20(a) of the Exchange Act.  They had the power and influence and exercised the same to cause PPG to engage in the illegal conduct and practices complained of herein.

## COUNT III

### Breaches of Fiduciary Duties and/or Aiding and Abetting
### Against All Defendants

121.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

122.    Each of the Defendants agreed to and did participate with the Officer Defendants and the other Defendants and/or aided and abetted one another in a deliberate course of action designed to breach the fiduciary duties the Defendants owed to the Company.

123.     The Defendants have breached fiduciary duties of care, loyalty, candor and independence owed to PPG and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of PPG and its shareholders.

124.     As demonstrated by the allegations above, Defendants failed to exercise the care required and breached their duties of loyalty, good faith, candor and independence owed to PPG and its public shareholders, failed to cause PPG to comply with the Administrative Order and applicable state and federal environmental laws, and failed to disclose material information and/or made material misrepresentations to shareholders regarding PPG's falsified financial reporting.

125.     By reason of the foregoing acts, practices and course of conduct, Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward PPG and its public shareholders.

126.     As a proximate result of Defendants' conduct, PPG has been injured and is entitled to damages.

## COUNT IV

### Abuse of Control Against All Defendants

127.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

128.     The Defendants employed the alleged scheme for the purposes of maintaining and entrenching themselves in their positions of power, prestige and profit at, and maintaining their control over, PPG, and to continue to receive the substantial benefits, salaries, and emoluments associated with their positions at PPG.  As a part of this scheme, Defendants actively participated in, or aided and abetted PPG's participation in, the violations of the Administrative Order and state and federal environmental laws, as well as the making of misrepresentations regarding PPG.

- 51 -

129.    Defendants' conduct constituted an abuse of their ability to control and influence PPG.

130.    By reason of the foregoing, PPG has been damaged.

## COUNT V

### Corporate Waste Against All Defendants

131.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

132.    By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by causing PPG to overpay more than $132 million to repurchase more than 15 million shares of PPG common stock on the open market during the Restatement Period, Defendants have caused PPG to waste valuable corporate assets.

133.    As a result of Defendants' corporate waste, they are liable to the Company.

## COUNT VI

### Unjust Enrichment Against the Officer Defendants

134.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

135.    As a result of the conduct described above, the Officer Defendants have each been unjustly enriched at the expense of PPG.

136.    The Officer Defendants received tens of millions of dollars in incentive compensation that was not earned or justified by the Company's actual performance in light of the Restatement. All these payments provided to the Officer Defendants were at the expense of PPG.  The Company received no benefit from these excessive payments.  PPG was damaged by such payments.  A constructive trust for the benefit of the Company should be imposed thereon.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment as follows:

A.      Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure Defendants do not participate therein or benefit thereby;

B.      Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all the payments of salaries, bonuses, fees, stock awards and options and imposing a constructive trust thereon;

C.      Directing PPG to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following corporate governance policies:

(b)      a proposal prohibiting the Company from repurchasing common stock on the open market or from senior executives pursuant to 10b5-1 trading plans within six months sales of PPG common stock by the Company's senior executives;

(c)      a proposal requiring that the offices of the CEO of PPG and Chairman of the PPG Board of Directors be permanently held by separate individuals and that the Chairman of the PPG Board meets rigorous "independence" standards;

(d)      a proposal to strengthen the PPG Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(e)      appropriately test and then strengthen the internal audit and control function;

(f)     rotate independent auditing firms every five years;

(g)     control and limit insider stock selling and the terms and timing of stock option grants; and

(h)     reform executive compensation, including banning the practice of rewarding executives for simply reporting financial results, if later proven to be false;

D.     Ordering the imposition of a constructive trust over Defendants' excessive compensation;

E.     Awarding punitive damages;

F.     Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

G.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  February 18, 2020          LAW OFFICE OF ALFRED G. YATES, JR., P.C.
                                   ALFRED G. YATES, JR. (PA 17419)
                                   GERALD L. RUTLEDGE (PA 62027)


                                        */s/Alfred G. Yates, Jr.*
                                   ALFRED G. YATES, JR.

                                   300 Mt. Lebanon Boulevard, Suite 206-B
                                   Pittsburgh, PA 15234-1507
                                   Telephone: (412) 391-5164
                                   412/471-1033 (fax)
                                   yateslaw@aol.com

                                   ROBBINS GELLER RUDMAN
                                   & DOWD LLP
                                   MARY K. BLASY
                                   58 South Service Road, Suite 200
                                   Melville, NY  11747
                                   Telephone:  631/367-7100
                                   631/367-1173 (fax)
                                   mblasy@rgrdlaw.com

- 54 -

ROBBINS GELLER RUDMAN
 & DOWD LLP
BENNY C. GOODMAN III
ERIK W. LUEDEKE
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)
bennyg@rgrdlaw.com
eluedeke@rgrdlaw.com

Attorneys for Plaintiffs